CATON *vs.* SHAW & TIFFANY.—June, 1827.

F applied *to* S & T for a loan of money, which they refused without security. He then brought to them the following letter from C: "Mr. F tells me that he is about to loan from you five hundred dollars, and wishes me to state that I will become his eventual security for the payment. This I am willing to do, as I believe Mr. F will be very punctual, having

found him so on similar occasions." Addressed to S & T. On its delive-
ry they said they would have nothing to do with C in money transactions.
The letter being left with them, and their refusal not communicated to
C, in a day or two after F again applied to them for money; they lent
him the sum of $300, nothing being then said about the guaranty; they
however retained it, placed it away among their evidences of debts due
them, and took from F his note for the amount of the loan—*Held*, that
there was evidence from which the jury might infer, that S & T accept-
ed C's letter as a guaranty for their loan to F, and that said letter was a
conclusive guaranty, for the eventual repayment of a loan not exceeding
the sum mentioned in it.

Where one makes a mere overture or offer to guarantee the transactions of
another, he is entitled to notice that it was regarded as a guaranty, and
meant to be accepted as such to convert his offer into a conclusive gua-
ranty.

A loan at par of bank notes passing at from 2 to 5 per cent. discount, unex-
plained by circumstances, would be usurious; but where the borrower
was at liberty to return them to the lender at their par value, and so ex-
empt himself from loss, such a transaction would not be deemed usuri-
ous, unless that privilege was a mere cover to cloak a usurious design.

APPEAL from *Baltimore* County Court. Action of *as-*
*sumpsit.* The first count in the declaration stated, that on the
29th of July 1817, in consideration that the plaintiffs, (the ap-
pellees,) at the special instance and request of the defendant,
(the appellant,) would lend and advance to *Abijah Fenn* such
sum of money as he should have occasion for, and require of
the plaintiffs not exceeding $500, he the defendant undertook
and promised the plaintiffs to stand security, and be accounta-
ble to them for such sum of money as they should lend and
advance to *Fenn.* The plaintiffs averred that they, confiding
in the said promise and undertaking of the defendant, did on
the 31st of July in the year aforesaid, lend and advance to *Fenn*
$300, which he then had occasion for, and required of the
plaintiffs. That *Fenn*, although requested, had not paid to the
plaintiffs the said $300, except $23 77 on, &c. and $50 on, &c.
but to pay the $300, except the said sums, &c. he hath refused,
&c. of which the defendant had notice on the 9th of March
1822, &c. Another count stating the same as above, and that
*Fenn* had become an insolvent debtor, &c. The defendant
pleaded *non assumpsit*, and issue was joined.

1. The plaintiffs at the trial gave in evidence the deposition
of *Abijah Fenn*, taken on the 22d of January 1825, by con-

sent of parties, to be read in evidence, subject to all legal objections. He deposed, that being in want of money, on or about the 29th of July 1817, he called on *Caton*, the defendant, to borrow some, having for many years had, as he still has, dealings and transactions with him; that *Caton* informed the deponent that he could not lend him any at that time, but that he was desirous of aiding him, deponent, and if deponent could obtain the money from any other person, he, *Caton*, would become deponent's security for the payment of it. Whereupon the deponent thinks that he informed *Caton* that the plaintiffs, *Shaw & Tiffany*, would lend deponent money upon his, *Caton's* security. Whereupon *Caton* wrote and signed the letter or instrument of writing hereto annexed, (marked A,) and delivered it to the deponent, which instrument of writing the deponent carried and delivered to the plaintiffs, as deponent thinks on the day of its date. That Mr. *Shaw*, one of the said firm, was present on the delivery of said instrument of writing, but deponent does not recollect whether Mr. *Tiffany*, the other partner, was present or not. That on receiving the said letter Mr. *Shaw* said that he knew Mr. *Caton* by hearsay, and as the deponent understood, said that he would not have any thing to do with Mr. *Caton* in transactions of money, or something like those expressions, which deponent does not pretend to state exactly, as he cannot recollect. That on the next day, or day afterwards, or within a few days, as near as deponent recollects, deponent called again at the store of the plaintiffs, when both said partners were present, and upon deponent's stating to them his want of money to take up a note in bank, becoming due, they the plaintiffs opened a drawer and showed deponent some money in bank notes, which they informed deponent that they were not making use of, it being principally of western country banks, and which they had laid by, and which they expected would come in play. The money was under par, and the plaintiffs told deponent, that if deponent would make use of said money that he might have it, and pay them at some future day; and they stated to deponent, that if he did not use the money he might return it and be credited to its amount. That deponent took the money, but he does not recollect the exact amount. He thinks the amount was about

$250. At the time of receiving said money deponent signed and gave to the plaintiffs the promissory note hereto annexed for $300, at 90 days, which deponent believes included an old balance previously due to them. That deponent carried the money to Mr. *John Perkins*, and asked him if he could manage to take up the note in bank, on which he and deponent were responsible, without discounting said money. Whereupon *Perkins* told deponent that he thought he could. Deponent went immediately to the *eastern shore* on other business, and on his return found that *Perkins* had procured it to be discounted at some exchange office. Deponent never ascertained how he discounted it. Deponent saith, that on the day of delivering the said letter or writing, the plaintiffs did not deliver to deponent any money. Deponent saith that he has no recollection of having made payment of any part of said money; but on seeing the sums endorsed on the promissory note hereto annexed, he presumes that he had paid those sums, and those only. Deponent saith that he obtained a final release under the insolvent laws of this state in *Baltimore* county court, after the date of the above mentioned letter of Mr. *Caton*, and the said promissory note. Deponent saith he never asked plaintiffs to return Mr. *Caton's* said letter. Questions on the part of the defendant—1. Was there any conversation between you (deponent,) and the plaintiffs respecting Mr. *Caton's* letter referred to in the deposition, on the day of your receiving the money? Answer. Deponent does not recollect that there was any thing said on that day about Mr. *Caton*, or his being security. 2. Did the plaintiffs lend you the money upon Mr. *Caton's* guarantee contained in his said letter? Answer. Deponent saith that he did not take it that they did. 3. Why do you draw this conclusion? Answer. Because of Mr. *Shaw's* declaration at the time of deponent's delivering him the letter as above stated by deponent. The plaintiffs also read in evidence the letter of the defendant attached to the said deposition marked (A)

*Balto.* 29 July, 1817.

Messrs. *Shaw & Tiffany*,

Sirs—Mr. *Abijah Fenn* tells me that he is about to loan from you five hundred dollars, and wishes me to state that I will become his eventual security for the payment. This I am

willing to do, as I believe Mr. *Fenn* will be very punctual, having found him so on similar occasions.

I am, respectfully, yrs.

*Rd. Caton.*

Also the note thereto attached, and referred to in said deposition:

*Baltimore,* July 31st, 1817.

For $300.

Ninety days after date I promise to pay *Shaw & Tiffany,* or order, three hundred dollars, for value received.

*Abijah Fenn.*

Witness. *C. N. Taylor.*

Endorsed, "Received Jany. 19, 1818, $23 77, on ac. within. March 25, 1818, Rec'd. $50.

*Shaw & Tiffany.*"

And also evidence that *Abijah Fenn* petitioned for the benefit of the insolvent laws of this state in August 1820, and obtained his final discharge upon said petition in April 1821. Also gave in evidence the following letter:

"*Baltimore,* Feb. 27, 1822.

*Richd. Caton,* Esq.

Dear Sir,—Mr. *Abijah Fenn* having borrowed a sum of money from us on the strength of your written guaranty, which we hold, we are compelled to address you on the subject of payment by the failure of Mr. *Fenn,* who has lately taken the benefit of the insolvent law. The balance remaining due us is near $250, and we wish the same paid or secured to us as soon as your leisure will permit. If payment is not convenient to you at present, we will allow a further time on receiving a bond with security.

Very respectfully, yr. ob. servt.

*Shaw & Tiffany.*"

Which letter is admitted to be in the handwriting of *William C. Shaw,* one of the plaintiffs, and to have been received by defendant on or about the day of its date. And also that the trustee of *Fenn,* under and by virtue of the said insolvent laws, had received no funds of *Fenn,* and had paid no dividend to his creditors. The plaintiffs also produced and offered in evidence by *Charles N. Taylor,* that he was the clerk of the

plaintiffs at the time the loan was made by the plaintiffs to *Abijah Fenn*, and the letter of *Caton* to the plaintiffs, and the note of *Fenn* in their favour attached to the deposition of *Fenn* were respectively given.   The witness on cross-examination also testified that the money loaned to *Fenn* was western country bank notes, meaning to include bank notes of *Frederick* county banks in this state.   That the plaintiffs were not in the practice of receiving lots of country money which averaged a discount of more than five *per cent*.   That some of the money may have been more than five *per cent*. discount, and some of less.    That witness does not think that the money loaned to *Fenn* would average a discount of more than five *per cent*. but he thinks that it would average from two to five *per cent*. discount.    That the plaintiffs were in the habit of occasionally passing off said country money at par, in the course of their business, and generally reserved it for the purpose of passing it at par, although generally they could not pass it at par.  Witness has no recollection of being present when the letter of Mr. *Caton*, which is attached to the deposition of Mr. *Fenn*, was presented to the plaintiffs.    But witness states that he knows that *Fenn* had applied to the plaintiffs to borrow money before he brought Mr. *Caton's* said letter to the plaintiffs; that the plaintiffs refused to lend *Fenn* money without some security besides himself.    Witness states that he repeatedly saw the said guaranty or letter of Mr. *Caton* in possession of plaintiffs; that they kept it in a small trunk of theirs among promissory notes due to them, and other papers.    Witness also stated that he witnessed the note given by *Fenn* to the plaintiffs.    Upon the foregoing evidence the defendant prayed the court to direct and instruct the jury, that the plaintiffs were not entitled to recover, and that they must find a verdict for the defendant.    Which direction and instruction the Court, [*Hanson* and *Ward*, A. J.] refused to give.    The defendant excepted.

2. The defendant then prayed the court to instruct the jury, that if they believed from the evidence that the money loaned to *Abijah Fenn* was country bank notes, which were at a greater discount than the legal interest on the sum loaned for ninety

days, that then the loan was usurious, and the contract, both between the plaintiffs and *Abijah Fenn,* and the plaintiffs and the defendant, is void. Which instruction the court refused to give; but instructed the jury, that if they believe the testimony of *Abijah Fenn,* the contract therein referred to is not usurious. The defendant excepted. Verdict and judgment for the plaintiffs; and the defendant appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Raymond* and *Latrobe,* for the Appellant, contended, 1. That there was no guaranty in this case, because the plaintiffs below, when the letter of the defendant was presented to them, refused to accept it as such.    2. That the transaction between the plaintiffs and *Fenn* was usurious, and therefore the guaranty was void.

1. There was no notice given to the defendant of the acceptance of the guaranty. *Lawrason v Mason,* 3 *Cranch,* 492. *Russell v Clark's Ex'rs.* 7 *Cranch,* 91.    *M‘Iver v Richardson,* 1 *Maule & Selw.* 557.    2 *Stark. Evid.* 648.    *Symmons v Want,* 3 *Serg. & Low.* 389.    *Creager v Higginson,* 1 *Mason's Rep.* 323.    *Russell v Perkins, Ib.* 368.

2. There was no evidence of a guaranty. If it is a guaranty it is to be strictly construed.    2 *Stark. Evid.* 614.    *King v Baldwin,* 2 *Johns. Ch. Rep.* 554.    *Ludlow v Simond,* 2 *Caine's Cas.* 1. The guaranty was of money not subject to a discount. Here the money loaned was at a considerable discount.    Part of the note was for money due from *Fenn* to the plaintiffs before the loan under the guaranty. It is therefore claimed to be a guaranty as well for the money loaned, as also for an old debt not contemplated to be guaranteed.

3. It was a usurious contract, and therefore void.    *Doe v Barnard,* 1 *Esp. Rep.* 11.    *Pratt v Willey, Ib.* 40.    *Rich v Topping, Ib.* 176.

4. The direction of the court to the jury was erroneous. It should have been left to the jury for them to say whether or not the money loaned was at a discount, &c.    *Massa v Dauling,* 2 *Stra.* 1243.    *Tate v Wellings,* 3 *T. R.* 531.    *Hammett v Yea,* 1 *Bos. & Pull.* 155.    *Rich v Topping,* 1 *Esp. Rep.* 176.

*Hinkley*, for the Appellees. 1. The loan of the money is evidence of the acceptance of the guaranty. When the letter was delivered there was but one of the partners present. There was no absolute refusal by him. When both were present the next day, the money was loaned. The substantial point in question is, was the money loaned upon the guaranty? One partner cannot loan the funds of the partnership. *Fell on Guar.* 64, *s.* 25. Here the guaranty is retained by the plaintiffs; and it is natural to suppose they would loan upon the guaranty, than upon *Fenn's* responsibility only. There is no distinction between a general and special guaranty. As a general rule there is no necessity to give notice of the acceptance of a guaranty. It is only necessary, as in the case of *M'Iver v Richardson*, 1 *Maule & Selw.* 557, which was considered as a mere overture to guarantee; but not where it is a conclusive guaranty. *Fell on Guar.* 51. *Com. on Cont.* 207, (Ed. 1826.) A guaranty is to be construed most strongly against the guarantor. *Stadt v Lill*, 9 *East*, 348. *Rogers v Warner*, 8 *Johns. Rep.* 119. *Lawrason v Mason*, 3 *Cranch*, 492. *Grant v Redsdale*, 2 *Harr. & Johns.* 186. *Ferris v Walsh*, 5 *Harr. & Johns.* 306. If it is a sufficient guaranty, and the acceptance is averred in the declaration, and the goods, &c. are delivered, it is implied as done at the request of the guarantor, and no notice is necessary. If notice is necessary, it is to be presumed from the evidence. But notice was not necessary. *Warrington v Furbor*, 8 *East*, 242. *Swinyard v Bowes*, 5 *Maule & Selw.* 62. *Fell on Guar.* 200, 217, 140. *Allen v Rightmere*, 20 *Johns. Rep.* 365.

2. The promissory note given by *Fenn* was payable at 90 days, without interest. This was perhaps to make up the difference in the value of the country bank notes which were loaned. The defendant prayed an absolute direction of the court to the jury in the *second* bill of exceptions. This prayer the court refused to give. What is the meaning of country bank notes? There were many banks incorporated by this state in the counties of *Frederick*, *Washington* and *Allegany*. These may be said to be country banks. The legislature by the act of 1818, *ch.* 191, declared that bank notes should not be passed for less than their nominal value. Bank notes have

always been treated as money. *Chitty on Bills*, 425, *(Phil. Ed.) Miller v Race*, 1 *Burr*. 457. *Fleming v Brook*, 1 *Sch. & Lef*. 318. *Knight v Criddle*, 9 *East*, 48   *Towson v Havre-de-Grace Bank*, 6 *Harr. & Johns*. 47. *Tate v Wellings*, 3 *T. R.* 531   *Maddock v Rumball*, 8 *East*, 304. 7 *Bac. Ab.* tit. *Usury*, (C) 190. *Cutler v How*, 8 *Mass. Rep*. 257. *Tyson v Rickard*, 3 *Harr. & Johns*. 109. *Coombe v Miles*, 2 *Campb*. 553. *Pike v Ledwell*, 5 *Esp. Rep*. 164. There is no criterion for judging of what is the discount of particular descriptions of bank notes. It varies according to the notions of lottery brokers, &c. The verdict ought not to be disturbed—interest is given in the nature of damages. *Chitty on Bills*, 538.

ARCHER, J. delivered the opinion of the court. It is contended that the court below should, upon the *first* bill of exceptions, have directed the jury that the plaintiffs were not entitled to recover, because the guaranty was not accepted by the plaintiffs below; but that the sum advanced must have been loaned solely upon the responsibility of *Fenn*, in whose favour the guaranty was given. This must depend upon the fact whether there be any evidence from which the jury might have been justified in drawing the inference that the guaranty was accepted. If there be any, the court below were right in refusing the direction, as it is the province of the jury to judge of the weight and sufficiency of evidence, and only for the court to determine whether there be any evidence. Now there were circumstances from which the jury might have been justified in drawing the inference that the guaranty was accepted. The refusal of the plaintiffs to lend money without security, their willingness, previously expressed, to lend on *Caton's* security, (which facts are to be inferred from the evidence of *Fenn*;) their loaning within a short time after the receipt of the guaranty; their retaining it, and placing it away with promissory notes and evidences of debts due them—These were all facts proper to go the jury, for the purpose of showing the loan of the money on the security and responsibility of *Caton's* letter. It is true that *Shaw*, when the letter was communicated to him, was understood to say, that he would have nothing

to do with *Caton* in monied transactions, or to have used expressions conveying some such idea. This seems to have been the expression of the first impression upon the *presentation* of the letter, which not having been communicated, as appears by any evidence in the cause, to *Caton*, could not preclude him, or him and his partner *Tiffany*, from advancing the money two days after upon the strength of the guaranty. It was retained by them, and the money loaned on the second day afterwards; they were not bound to accept *immediately*, but they might have kept the letter for inquiry and consideration, notwithstanding the expression of *Shaw* on its first receipt. Although nothing was said, when the money was loaned, of the lending upon the security of *Caton's* letter; yet as the letter was retained, and the money actually advanced, it was properly a question, under all the circumstances, to be submitted to the consideration of the jury. But it is said that notice of acceptance, and notice of the extent of advances by the plaintiffs, should have been given to enable them to recover against the defendant; and this objection is grounded on the idea that this is a mere *overture* or *offer* to guarantee. If it is to be considered as a guaranty, there is an end of the objection. None of the authorities in such an event deemed such notice at all necessary. In the case of an offer to guarantee, it was determined in *M'Iver v Richardson*, 1 *Maule & Selwyn*, 563, that notice should be given, that it was regarded as a guaranty, and meant to be accepted, or that there should have been a subsequent assent, on the part of him who made the overture, to convert that, which was merely intended as an offer, into a conclusive guarantee. This doctrine has been adopted in *New York*. This then being the law, we are brought to the question, whether the letter of Mr. *Caton*, which furnishes the foundation of this suit, is to be considered as an *offer*, or as a *guaranty?* We are at no loss here, as were the court, in the case of *M'Iver v Richardson*, to ascertain the circumstances which gave rise to the letter, or under what representation he signed it. He was explicitly informed, that upon his security, the plaintiffs would lend the money; and declaring his willingness to go the security to enable *Fenn* to procure the loan, he addresses, under these circumstances, the letter which is the subject of controversy.

He was then perfectly aware, that upon his letter the money would be obtained. He was apprized before he wrote it that it would be accepted, and he had declared his determination to become *Fenn's* security. With this information, and in this spirit, he prepares and delivers the letter. Its language appears to be very explicit. We will advert to it. "Mr. *A. Fenn* tells me that he is about to loan from you five hundred dollars, and wishes me to state that I will become his eventual security for the payment; this I am willing to do, as I have found him punctual on similar occasions." The substance of the letter is this: "I will become his eventual security for payment." Here is then no conditional engagement, but a conclusive undertaking. In *M'Iver v Richardson*, the court considered the paper there offered *as a proposition only* leading to a guarantee. The words do not here import that if application were made to him he would guarantee; it required no intimation that it was regarded as a guaranty, for it spoke so intelligible a language that it could not be mistaken; and it is shown by the evidence that it conveyed to the plaintiffs the idea intended, which was, that he would be security for money loaned to the amount mentioned in the letter.

The *second* bill of exceptions is founded on the idea that the loan of bank notes, at a greater discount than the legal interest on the note for the time it had to run, was usurious. There cannot be a question but that the loan of bank notes passing at from 2 to 5 *per cent* discount, and passing them in such loan, notwithstanding such discount, at their par or nominal value, unexplained by circumstances, would be usurious, and that it would render the contract between *Fenn* and the plaintiffs void; for the courts will not permit the statute to be evaded by any devices, however subtle or artful, but will pursue the transaction through all its ramifications, for the purpose of discovering whether a loan of money at an exorbitant interest, and an evasion of the statute, has not been the real object and design of the parties; and they must be governed by such design or intention, when it shall have been collected from all the circumstances. No usurious intent can be here attributed to the plaintiffs. They take *Fenn's* note for the par value of the bank notes loaned, but at the same time inform him, that if he

should not use them he was at liberty to return them, and he should be credited at their par value. From which the inference is clearly deducible, that they had no intention that they should be passed for less than their nominal amount; this fact, taken in connection with their habit, as proven, of taking such notes to be passed at par, evidence a clear manifestation of the nonexistence of any usurious design. It was always in the borrower's power to exempt himself from a loss upon these notes by returning them to the plaintiffs, who had stipulated, whenever this was done, to credit him with their nominal amount. This he did not think proper to do, but through his agent passed them off at a discount; having done so, he could not rid himself from the payment by alleging usury in the transaction, unless indeed this privilege had been a mere cover to cloak the usurious design of the parties, for which there is not the slightest ground for inference or belief. We conceive, therefore, that no error exists in either direction of the court.

JUDGMENT AFFIRMED.